**FILED**

EC JUL 20 2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. **20 CR 371** |
| v. | ) ) | |
| CRAIG O'NEIL | ) ) ) | Violation: Title 18, United States Code, Section 371 |

**JUDGE SEEGER**

**MAGISTRATE JUDGE WEISMAN**

The UNITED STATES OF AMERICA charges:

1. At times material to this Information:

   a. Defendant Craig O'Neil ("O'NEIL") was a resident of Florida. He was the owner and manager of KP Network, LLC ("KPN").

   b. KPN was a marketing company located in Florida, which sold, among other things, patient leads.

   c. Mark Sorensen ("Sorensen") was a resident of Chicago, Illinois. He was the President and owner of a durable medical equipment ("DME") pharmacy, Symed, Inc. ("Symed"), which was located in Chicago, Illinois. Sorensen enrolled Symed with Medicare and other federal health care benefit programs.

   d. Polina Goncharova ("Goncharova") was a resident of Chicago, Illinois. Goncharova was employed at Symed as the Vice President of Finance and was involved in financial matters for Symed.

   e. Individual A operated a DME manufacturing company which, among other things, operated as a broker for leads, which Individual A sold to Symed.

1

### Patient Lead Generation

f.  Medical providers sometimes used marketing companies to increase the number of patients using their services. This included purchase of patients' information to market to the patients directly. To do this, providers purchased lists with patient names, phone numbers, and emails. In the industry, this information was referred to as a "raw lead," meaning that it was a lead on possible additional patient business.

g.  "Raw leads" were developed into "completed leads," which included not only the patient's name, phone number, and email, but also the patient's doctor's name, the doctor's contact information, the patient's federal health care benefit program enrollment number (such as the patient's Medicare identification card number), and other information about the patient.

h.  "Completed leads" were sometimes supplemented with a signed doctor's order prescribing a specific type of DME to the patient whose name appeared in the completed lead.

### Federal Health Care Benefit Programs

i.  Medicare was a federal health care program providing benefits to disabled persons or persons who were 65 years of age or older. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

j. Physicians, clinics, and other health care providers who provided services to Medicare beneficiaries were able to apply to enroll with Medicare and obtain a Medicare provider number. A health care provider who was issued a Medicare provider number was able to file claims with Medicare and receive reimbursement for those services.

k. By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all the provisions of the Social Security Act, including the Federal Anti-Kickback Statute, as well as the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided with online access to Medicare manuals and service bulletins describing proper billing procedures and billing rules and regulations.

l. To receive reimbursement for a covered service from Medicare, a provider was required to submit a claim, either electronically or using a form (e.g., a CMS-1500 form or UB-92 form), appropriately identifying the provider, patient, and services rendered, among other things.

m. The Department of Labor Office of Workers Compensation Program ("OWCP") administered benefits payable under the Federal Employees' Compensation Act, Title 5, United States Code, Sections 8101 *et seq.*, which provided

medical payments and compensation benefits to federal employees who sustained on the job injuries.

  n. Medical providers who provided services to OWCP claimants were required to enroll with OWCP.

  o. TRICARE was a health care program for uniformed service members of the U.S. military, as well as military retirees and their families. TRICARE was managed by the Defense Health Agency, which fell under the United States Department of Defense.

  p. Medical providers who provided services to TRICARE claimants were not necessarily required to become enrolled providers. However, if a provider did not enroll, the provider was typically paid less favorable rates for services performed and items provided.

  q. Medicare, OWCP, and TRICARE were Federal health care programs, as defined in Title 18, United States Code, Section 24.

  r. All Medicare, OWCP, and TRICARE claims were required to set forth, among other things, the beneficiary's name, the date the services, the type of services provided (using a CPT code), the billed amount of the services provided, and the name and identification number of the physician who provided the services.

  s. Medicare, OWCP, and TRICARE paid for medically necessary DME for qualifying beneficiaries in certain circumstances. DME could include back, shoulder, wrist, knee, and ankle braces.

t. For example, according to the Medicare Claims Processing Manual (Chapter 20, Section 10.2), for Medicare to cover the cost of DME, it must have been medically necessary, prescribed by a physician, and for use in a patient's residence other than a health care institution (such as a hospital or nursing home). To collect payments, the DME supplier "must maintain and, upon request, make available to [Medicare], the detailed written order (or, when required, the Certificate of Medical Necessity (CMN)) from the treating physician."

u. To receive reimbursement for a covered service from Medicare, OWCP, or TRICARE, a provider was required to submit a claim, either electronically or using a paper form, appropriately identifying the provider, patient, and services rendered.

2. Beginning no later than in or around June 2015 and continuing through at least in or around April 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

CRAIG O'NEIL,

defendant herein, together with Sorensen, Goncharova, Individual A, and others known and unknown to the Grand Jury, did conspire to:

a. knowingly and willfully offer and pay any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, to induce the referral of signed DME prescriptions to Symed, for the furnishing and arranging for the furnishing of items and services for which payment may be made in whole or

in part under a Federal health care program, namely, Medicare, OWCP, and TRICARE, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A); and

b. knowingly and willfully solicit and receive any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in return for providing referrals of signed DME prescriptions to Symed, for the furnishing and arranging for the furnishing of services for which payment may be made in whole or in part under a Federal health care referring program, namely, Medicare, OWCP, and TRICARE, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

## Purpose of the Conspiracy

3. It was the purpose of the conspiracy for O'NEIL, Sorensen, Goncharova, Individual A, and others, to unlawfully enrich themselves by, among other things, (a) submitting and causing the submission of false and fraudulent claims to Medicare, OWCP, TRICARE, and other federal health care benefit programs, for DME that were medically unnecessary, not wanted, and procured through the payment of kickbacks and bribes; (b) concealing and causing to be concealed the submission of false and fraudulent claims to Medicare, OWCP, TRICARE, and other federal health care benefit programs; and (c) diverting the proceeds of the fraud scheme for their personal use and benefit.

## Manner and Means of the Conspiracy

4. It was part of the conspiracy that Sorensen and Goncharova paid Individual A in kickbacks and bribes, in return for Individual A providing Symed with signed DME prescriptions.

5. It was further part of the conspiracy that Sorensen and Goncharova submitted, and caused to be submitted, claims for DME that were medically unnecessary, not wanted, and procured through the payment of kickbacks and bribes, to Medicare, OWCP, TRICARE, and other federal health care benefit programs, based on the signed DME prescriptions Individual A provided.

6. It was further part of the conspiracy that Sorensen and Goncharova paid the kickbacks and bribes to Individual A on a per-prescription amount determined as a percentage of what the federal health care benefit program paid for each prescription.

7. It was further part of the conspiracy that after Individual A received payment from Sorensen and Goncharova, Individual A paid O'NEIL in kickbacks and bribes in return for O'NEIL providing patient leads which generated some of the signed DME prescriptions Individual A sold to Symed.

8. It was further part of the conspiracy that O'NEIL made it appear that the contract payment terms between O'NEIL and Individual A were legitimate by fabricating "marketing services" invoices which O'NEIL provided to Individual A.

9. It was further part of the conspiracy that O'NEIL, Sorensen, Goncharova, Individual A, and others submitted, and caused to be submitted, claims for DME that were medically unnecessary, not wanted, and procured through the

payment of kickbacks and bribes to Medicare, OWCP, and TRICARE, for which these programs paid Symed at least approximately $24,893,191.

## Overt Acts

10. In furtherance of the conspiracy and to effect its objects and purposes, O'NEIL, along with Sorensen, Goncharova, Individual A, and others, committed and caused to be committed the following overt acts, among others, within the Northern District of Illinois, and elsewhere:

    a. On or about September 8, 2015, Sorensen caused an ACH bank transfer from Symed's bank account ending in 6245 to Individual A's bank account ending in 1199 for approximately $16,224 in payment for completed leads, which were proceeds of kickback payments received by Sorensen.

    b. On or about September 29, 2015, Individual A caused a wire from Individual A's bank account ending in 1199 to KPN's bank account ending in 3777 for approximately $43,533, which were proceeds of kickback payments received by Sorensen.

    c. On or about November 23, 2015, Individual A sent O'NEIL an email notifying O'NEIL that Individual A intended to wire $22,179 to O'NEIL, and requested an invoice for that amount.

d. On or about November 24, 2015, O'NEIL created an invoice to Individual A's company for $22,179, claiming that O'NEIL provided "marketing services" to Individual A;

All in violation of Title 18, United States Code, Section 371.

_____
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION
CHIEF

_____
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION
DEPUTY CHIEF